<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| AVAYA, INC., : | |
| : | |
| Plaintiff, : | Civ. No. 06-2490 (GEB) (JJH) |
| : | |
| v. : | **MEMORANDUM OPINION** |
| : | |
| TELECOM LABS, INC., TEAMTLI.COM : | |
| CORP., CONTINUANT, INC., SCOTT : | |
| GRAHAM, DOUGLAS GRAHAM, and : | |
| BRUCE SHELBY, : | |
| : | |
| Defendants. : | |
| : | |

<u>**BROWN, Chief Judge**</u>

This matter comes before the Court upon the motion of plaintiff Avaya, Inc. ("Avaya") to

dismiss the first through sixth causes of action asserted in the Amended Counterclaims and Jury

Demand of defendants/counterclaimants Telecom Labs Inc. ("TLI") and Continuant, Inc.

("Continuant," collectively "Counterclaimants").   This Court has jurisdiction over this matter

pursuant to 28 U.S.C. §§ 1331, 1332.  The Court has considered the parties' submissions and

decided the matter without oral argument pursuant to Federal Rule of Civil Procedure 78.  For

the reasons set forth below, this Court will grant in part and deny in part Avaya's motion to

dismiss.

**I.      BACKGROUND**

**A.      Procedural History**

This suit began on June 2, 2006 when Avaya filed a complaint against Counterclaimants

and TeamTLI.com Corp. ("Team") alleging, among other things, that TLI, Team and Continuant gained unauthorized access to Avaya systems. In its original complaint, Avaya asserted ten causes of action. On July 14, 2008, Avaya filed a Third Amended Complaint, which added three new causes of action.[1]

On March 14, 2008, TLI and Continuant filed their Amended Counterclaims and Jury Demand ("Counterclaims"). The Counterclaims consist of ten causes of action: (1) monopolization in violation of Section 2 of the Sherman Act; (2) conspiracy to monopolize in violation of Section 2; (3) attempted monopolization in violation of Section 2; (4) tying the receipt of patches and upgrades for the Definity systems to the purchase of service and maintenance in violation of Section 1 of the Sherman Act; (5) tying the receipt of patches and upgrades for Avaya's PDS systems to the purchase of service and maintenance in violation of Section 1; (6) illegal conspiracy in violation of Section 1; (7) tortious interference with business/contractual relations; (8) tortious interference with a prospective business or economic advantage; (9) injurious falsehood/trade libel or slander; and (10) breach of implied covenant of good faith and fair dealing.

On April 18, 2008, Avaya filed the present motion to dismiss the first six causes of action in the Counterclaims. Briefing was completed on June 23, 2008.

### B.    PBX Systems and PDS Platforms

This case involves two telecommunications systems: (1) "Private Branch Exchange" systems, also known as "PBX" systems; and (2) "Predictive Dialing System" platforms, also

---

[1] The second time Avaya amended its complaint, it added Scott Graham, Douglas Graham, and Bruce Shelby as defendants.

known as "PDS" platforms.

PBX systems are telephone switching systems containing hardware, firmware and software.  PBX systems are used by mid-to-large sized companies and other enterprises to connect their voice communications to the public voice networks.  (Avaya's Br. at 6; Counterclaims ¶ 1.)  Avaya manufactures, sells and services PBX systems.[2]  According to Counterclaimants, the PBX systems manufactured, sold and serviced by Avaya and its predecessors are commonly referred to as the "Definity" platform.  (Counterclaims ¶ 31.)  Other manufacturers currently produce and sell competing PBX systems.  (Id. ¶¶ 1, 35.)

PDS platforms are hardware and software systems that offer outbound predictive telephone dialing.  (Id. ¶ 49.)  Avaya's PDS platform "automate[s] dialing and increase[s] dialing efficiency by predicting call outcomes based upon a number of factors."  (Id.)  In 1999, Avaya's predecessor, Lucent, acquired a company that manufactured and sold a PDS platform. (Id. ¶ 48.)  After the acquisition, Lucent began to manufacture and sell the PDS platform.  (Id. ¶ 51.)  As a result of its spin off from Lucent, Avaya took over the manufacture and sales of the PDS platform.  (Id. ¶ 56.)

### C.    Counterclaimants

The Counterclaimants specialize "in the maintenance and service of various telecommunications systems manufactured and sold by Avaya" including Avaya's PBX and PDS systems.  (Counterclaims ¶ 3.)

---

[2] In October 1996, American Telephone and Telegraph Company ("AT&T") spun off various telecommunication business units to form Lucent Technologies, Inc. ("Lucent"). (Counterclaims ¶ 40.)  On September 2000, Lucent spun off its "enterprise network group" to form Avaya.  (Counterclaims ¶ 1, 55.)

TLI was a Lucent dealer from 1996 to 2000, during which time it resold products manufactured by Lucent and other manufacturers and rarely offered maintenance contracts. (Id. ¶¶ 69-72.) When Avaya was spun off from Lucent in 2000, Lucent's dealer contracts were assigned to Avaya. Thus, TLI became an Avaya dealer. Subsequently and due in part to the negative effects that Avaya's downsizing had on Avaya's own service abilities, Avaya began to encourage TLI and other Avaya PBX dealers to perform service and maintenance on the Definity platforms. (Id. ¶¶ 60, 65, 74, 75.) TLI began hiring former Avaya employees and actively competing for Avaya's existing maintenance contracts thereby "substantially increasing [its] revenue." (Id. ¶¶ 75, 78, 80.)

According to the Counterclaims, "[s]ometime after Avaya's spin-off" and "[t]o avoid competition from dealers . . . Avaya revised the standard dealer contract . . . and created a new Avaya One reseller agreement." (Id. ¶ 88.) The new "Avaya One" reseller agreements designated the dealers as "BusinessPartners" and "contained a strict and express non-compete provision that explicitly prohibited BusinessPartners from offering competitive maintenance contracts to any existing Avaya maintenance customer." (Id. ¶ 89.) TLI sought modification of this provision, and "[u]ltimately, Avaya and TLI agreed upon a compromise, whereby TLI accepted a limited non-compete provision that precluded it from seeking long-term maintenance contracts from Avaya's top 874 customers, known as 'VCP' customers." (Id. ¶ 102.) With this modification, TLI signed the new contract with Avaya on March 31, 2003 ("2003 Contract"). (Id. ¶ 103.) However, according to the Counterclaims, in "May 2003, Avaya told TLI that its only options were either to stop offering maintenance contracts to *all* Avaya customers . . . or be terminated" as an Avaya dealer. (Id. ¶ 105.) Then "four months after [the 2003 Contract] was

executed" Avaya allegedly "improperly, immediately reneged on its contractual obligations" and terminated the 2003 Contract without the contractually required sixty days advance written notice.  (Id. ¶ 108-109.)  Since the time the 2003 Contract was terminated, TLI has acted as an independent service provider ("ISP") for Avaya Definity equipment.  (Id. ¶ 15.)[3]  The Counterclaims allege that Avaya terminated the BusinessPartner status of any former dealer that did not sign the new "Avaya One" contract.  (Id. ¶ 115.)

The other Counterclaimant, Continuant, "has never had a relationship with Avaya, and has instead always acted as an [Independent Service Provider] for Definity and PDS equipment." (Id. ¶ 16.)  In 2005, Continuant acquired a company that offered maintenance and service to Avaya PDS owners.  Continuant has continued to provide such maintenance and service.  (Id. ¶¶ 83-84.)

**D.    System Logins**

The Counterclaims allege that Avaya's Definity system uses a "login" procedure to restrict access to the "telephony application software" (herinafter, the "software") embedded in the Definity system.  (Id. ¶ 136.)[4]  Access to the software is necessary to perform service and maintenance on a Definity system.  (Id. ¶ 306.)  The "login" procedure requires a user to enter

---

[3] It appears that Avaya refers to ISPs as "unauthorized service providers." (Counterclaims ¶ 280; Avaya's Br. at 8.)  The Court uses the terms interchangeably.

[4] According to the Counterclaimants, Definity systems "contain two types of software - the operating systems software and the telephony application software."  (Counterclaims ¶ 126.) The operating systems software "perform[s] basic systems tasks such as controlling and allocating memory, managing the sharing of resources and files of a system, and providing a platform for other software applications."  (Id. ¶ 127.)  "[T]he telephony application software, which is loaded on to the main server of a Definity system, is designed generally to provide all of the functions and features of the phone system purchased by the customer."  (Id. ¶ 129.)

into the system a "username" and a "password," collectively known as a "login."  (Id. ¶ 136.)

System owners and service technicians use different types of logins that are associated with

different levels of access to the system.  (Id. ¶ 140.)  Once users are logged in to the system, they

may enter certain commands, which assist in the service and maintenance of the system.

Individuals with high level access are able to execute commands that individuals with lower level

access are not able to execute.

According to the Counterclaims, there are various levels of logins for technician services,

the lowest of which is the "CRAFT" login.  (Id.)  In 2001, Avaya introduced an alternative login,

called the "DADMIN" login, which was available to Avaya dealers at no charge, upon written

request from a Definity system owner.  (Id. ¶ 155, 158.)  Prior to 2001, "Avaya resellers, dealers

and BusinessPartners were given CRAFT logins."  (Id. ¶ 156.)  The DADMIN login allows the

dealers to execute the same basic commands that are capable of being executed with a CRAFT

login.  (Id. ¶ 157.)

The Counterclaimants assert that there are two levels of logins available to Definity

system owners: a "user" login and a "super-user" login.  (Id. 140.)  In the late 1980's, in response

to the desire of large Definity system owners to perform basic maintenance themselves, Avaya

created Maintenance Software Permissions ("MSPs").  "[O]nce enabled [MSPs] simply allow a

customer, using certain, pre-existing customer-level logins, to execute certain commands that

allow for performance of maintenance functions."  (Id. ¶ 143.)

A Definity system owner that has a "super-user" login with an MSP can perform the same

basic commands that are capable of being executed with a CRAFT or DADMIN login.  (Id. ¶

140.)  Thus, there have been at least three ways to login to a Definity system for maintenance

6

purposes: through a CRAFT login, through a DADMIN login, or through a "super-user" login with MSP.

Originally, owners could activate MSPs by paying a one time fee, which according to Counterclaimants, "represented the actual cost for a technician to install the MSP." (Id. ¶ 147.) Importantly, the Counterclaimants allege that "AT&T and Lucent did not prohibit a customer that purchased MSPs to authorize a third party vendor or service provider of the customer's choosing from accessing its Definity system." (Id. ¶ 146.)

In 1996 Lucent changed its policy with respect to MSPs. Under the new policy, "MSPs were provided without additional cost to end-users who requested them and maintained a service contract with Lucent." (Id. ¶ 151.) However, "[e]nd users who did not have a service contract with Lucent could also obtain MSPs through a Maintenance Assist Offer." (Id.) The "Maintenance Assist Offer" requires the end-user to pay a monthly fee for its MSP access. (Id.) Counterclaimants allege that from 1996 to March 2005, Owners could obtain MSPs in this manner regardless of whether they had service contracts with Lucent. (Id. ¶¶ 151, 185-190, 208.) Initially, Avaya continued to offer this option to users after it was spun-off from Lucent. (Id. ¶ 153.)

Counterclaimants also allege that AT&T and Lucent did not disclose to buyers of Definity systems any restrictions on the customers' ability to access or use the commands necessary to perform maintenance, or use of ISPs to do so. (Id. ¶¶ 160-173.) Indeed, Counterclaimants reference portions of a Purchase/Service Agreement used by Lucent as early as 1996, which allegedly granted the system owners a broad general license to use the software without restriction in terms of access to specific commands for maintenance. (Id. ¶¶ 174-76.)

E.    **Allegations Concerning Avaya's Conduct**

Counterclaimants assert that in response to increasing competition in the service and maintenance market, "Avaya implemented a series of increasingly aggressive policies to restrict access to the necessary passwords and permissions." (Id. ¶ 191.)[5] First, in March 2003, Counterclaimants allege that Avaya made changes to the Purchase/Service Agreement for new owners, so as to make "non-sublicensable" the license given to owners to use the software. (Id. ¶ 194.) Counterclaimants allege that Avaya has wrongly sought to apply the new Purchase/Service Agreement retroactively. (Id. ¶¶ 205, 208.)

Moreover, in March 2005, Avaya began charging owners more for MSPs through Maintenance Assist Offers, unless the owners were eligible for a "loyalty discount." (Id. ¶ 215.) The "loyalty discount" was given to system owners that "have not and will not contract with any un-authorized 3rd party to provide on-going support." (Id.) With the "loyalty discount," the price of the Maintenance Assist Offer to an owner remained the same as before; without it, the price doubled. (Id.)

In July 2005, Avaya further restricted a Definity system owner's ability to utilize ISPs for service and maintenance by changing its policy so as to not provide MSPs to any owner that did not have a maintenance contract with Avaya or a BusinessPartner. (Id. ¶¶ 219-222.)

Avaya also allegedly changed its policy regarding whether software "patches" were available to owners. Patches are "not considered upgrades of the . . . software, but instead are

---

[5] Counterclaimants allege that no other manufacturer of PBX systems blocks access to an owner's ability to perform maintenance functions using the software on the purchased system. (Id. ¶ 168.)

fixes to errors . . . that are discovered in the . . . software that a customer has already purchased." (Id. ¶ 223.)  According to the Counterclaimants, Avaya is the only source for the patches for its PBX and PDS systems.  (Id. ¶ 226.)  Prior to October 2005, "patches were provided to all end-users free of charge and were available to the public on Avaya's website."  (Id.)  However, as of October 2005, Avaya began enforcing its new policy regarding patches by placing "patches behind a firewall and institut[ing] a login procedure designed to limit access to the patches to end-users who had a service contract with Avaya or an Avaya BusinessPartner."  (Id. ¶ 224.)

Similarly, "[s]ometime after 2005," Avaya made changes to the request form used by Definity system owners to request a DADMIN login.  The changes specified that DADMINs were "for the use of the BusinessPartner 'only'" and that Avaya was permitted to later remove the DADMIN password.  (Id. ¶¶ 211-13.)

Counterclaimants next allege that after July 2005 Avaya began sending letters to Definity system owners that explained that "unauthorized vendors" did not have access to Avaya logins and therefore the "unauthorized vendors" would have a reduced ability to support and maintain Avaya systems.  (Id. ¶¶ 228-232.)  Counterclaimants assert that this is the first time Avaya "began, as a general practice to disclose to Definity owners that the ability to maintain a Definity system" would be reduced without a login.  (Id. ¶ 233.)  Additionally, "in or after 2004," Avaya issued a written communication to its BusinessPartners specifically advising them not to perform any service subcontract work for TLI or on behalf of TLI's customers."  (Id. ¶ 244.)

Counterclaimants also allege that Avaya then began "tracking customers" of ISPs and that Avaya would, sometimes through deceptive tactics,  "dial into these customer's phone systems to disable MSPs and otherwise lock out the Definity owners" (Id. ¶ 249-256.)  Additionally,

Counterclaimants allege that Avaya sent defamatory letters to Counterclaimants customers. (Id. ¶¶ 257-273.)

Finally, in late 2007, Avaya released an "upgrade" for its Definity system software and "announced a new policy with respect to the conditions under which Avaya will" sell the upgrade to owners of Definity systems. (Id. ¶ 276.) Allegedly, those conditions require an owner to purchase a maintenance agreement from Avaya. (Id. ¶ 277.) In light of Avaya's policy that it will not provide support to any customer that has used or uses an ISP, "a Definity owner who uses an ISP for maintenance . . . is effectively prohibited from upgrading" even if the owner were willing to pay for the Avaya maintenance. (Id. ¶ 280.) Counterclaimants also alleged that with the upgrade, Avaya made additional policy changes regarding the use of MSPs. Specifically, "Avaya now includes MSPs enabled at no additional charge" for customers that obtain the upgrade. (Id. ¶ 282.) However, Avaya also announced that "asset owners/end users are strictly prohibited from authorizing, assisting or otherwise permitting any third party . . . to access MSPs or passwords/logins related to MSPs." (Id. ¶ 283.)

## F.    Antitrust Counterclaims

All six of the counterclaims at issue in this motion concern alleged violations of the Sherman Act, 15 U.S.C. §§ 1-7. Five of the counterclaims concern the market for PBX service and maintenance. One counterclaim concerns the market for PDS service and maintenance.

### 1.    PBX-related Counterclaims

#### a.    Sherman Act Section 2 Counterclaims

Counterclaimants allege that Avaya has monopolized, conspired to monopolize and attempted to monopolize the relevant market consisting of "post-warranty service and

10

maintenance for Avaya Definity systems, including the submarkets for the provision of service and maintenance and the sale of maintenance contracts [in] the United States." (Counterclaims ¶¶ 296.) Counterclaimants allege that there are "no reasonably interchangeable substitutes for the service and maintenance of . . . Avaya Definity equipment or [the] purchase of maintenance contracts." (Id. ¶ 296.) Counterclaimants allege that "[d]issatisfied Avaya PBX owners . . . . are 'locked into' their PBX purchases" due to "extremely high switching costs . . . and . . . the PBX's extremely long useful life." (Id. ¶ 297.) Moreover, Counterclaimants allege that "customers were not, at the time they purchased their systems, able to accurately predict the life-cycle cost of their system and compare it to the cost of purchasing a competitor's system." (Id. ¶ 298.)

Counterclaimants assert that Avaya has "at least 60 percent" of the market share in the relevant market. (Id. ¶ 8.) Counterclaimants allege that Avaya has market power due to this market share, its control over the logins, parts and upgrades, its proven ability to exclude third party servicers and its ability to charge supra-competitive prices. (Id. ¶ 300.) Allegedly, Avaya's monopoly power was acquired and maintained through intentional exclusionary conduct. (Id. ¶¶ 300-301.) The alleged conduct includes "tying and bundling maintenance to crucial patches and upgrades; filing this lawsuit containing meritless and pretextual intellectual property claims; making false and defamatory statements about Counterclaimants to customers and others; threatening customers who use, or are considering using, Counterclaimants' maintenance services; and constantly shifting its policies with regard to customers and ISPs' ability to access the customers' Avaya systems, the pricing of access to logins needed to self-maintain their products, and the customers' use of independent, 'unauthorized,' maintenance providers." (Id. ¶ 303-05.)

11

With respect to the attempt to monopolize counterclaim, Counterclaimants allege that "Avaya specifically intends to eliminate or foreclose competition in the Relevant Markets through the tactics described above." (<u>Id.</u> ¶ 324.)  The Counterclaims state that "[a]bsent action by this Court . . . there is a dangerous probability that Avaya will succeed in obtaining a monopoly in the Relevant Markets." (<u>Id.</u> ¶ 328.)

With respect to the conspiracy to monopolize counterclaim, Counterclaimants allege that "Avaya's conduct . . . has been undertaken not only individually but also in concert with, and pursuant to agreements with, its co-conspirator BusinessPartners." (<u>Id.</u> ¶ 316.) Counterclaimants allege that "Avaya's and its co-conspirators' monopoly power" is evidenced by their collective market share, which is "over 90% of sales in the relevant market." (<u>Id.</u>) Allegedly, the conspirators' monopoly power is also evidenced by their power to exclude competition and to charge supra-competitive prices. (<u>Id.</u>)

### b.    Tying in Violation of Sherman Act Section 1

The Counterclaims state that "[t]he provision of maintenance and service for Avaya Definity systems . . . is a separate product from patches and upgrades for Avaya Definity systems" and that "Avaya has conditioned the purchase or receipt of patches and upgrades . . . on the purchase of service and maintenance." (<u>Id.</u> ¶¶ 332, 334.)  "Avaya is the *only* source for patches and upgrades for Avaya Definity telecommunications systems." (<u>Id.</u> ¶ 335.)  The patches and upgrades "are the only way for systems owners to keep their systems functioning properly and at a state-of-the-art level." (<u>Id.</u>)  According to the Counterclaims "Avaya has told customers that if they obtain maintenance or services from [ISPs,] Avaya will not provide or sell them these crucial patches and upgrades." (<u>Id.</u> ¶ 334.)  This "forc[es] customers to choose Avaya

12

maintenance and service over that of lower cost or better quality ISPs."  (Id. ¶ 335.)

Counterclaimants assert that "[b]ecause it possesses market power [patches and upgrades],

Avaya's tying is unlawful *per se*."  (Id. ¶ 337.)  Moreover, the Counterclaims state that the tying

is also unlawful under the rule of reason.  (Id.)

### c.    Illegal Conspiracy in Violation of Sherman Act Section 1

Counterclaimants allege that, in violation of Section 1, "Avaya has orchestrated a

horizontal conspiracy involving certain of its BusinessPartners, distributors of certified Avaya

parts, and others to allocate the maintenance and service business of Definity owners, to restrict

the output of available maintenance and service, and, as a result, to fix and raise the prices of

maintenance and service paid by owners."  (Id. ¶ 355.)  Counterclaimants assert that this is a *per

se* illegal conspiracy, and is also illegal under the rule of reason.  (Id. ¶ 357.)

### 2.    PDS Counterclaim:  Tying in Violation of Section 1

The Counterclaimants also allege that Avaya was able to use its market power in PDS

system patches and upgrades to force PDS owners to "choose Avaya maintenance and service

over that of lower cost or better quality ISPs."  (Id. ¶ 349.)  The Counterclaims specify that "[f]or

purposes of this claim the relevant . . . market . . . is the market for post-warranty service and

maintenance of PDS systems purchased from Avaya."  (Id. ¶ 342.)  Counterclaimants assert that

this market is separate from the "primary U.S. market for the sale of PDS systems" and that

"[t]here are no reasonably interchangeable substitutes" for such service and maintenance.  (Id.)

Counterclaimants state that "virtually all, if not all, owners of Avaya PDS systems are 'locked

into' their PDS purchases" due to high switching costs and the platform's long useful life.  (Id. ¶

343.)  Moreover, according to the Counterclaims the PDS customers were, for various reasons,

unable to predict the "life-cycle cost" for their PDS system. (Id. ¶ 344.)  The Counterclaims

state that the PDS patches and upgrades "are uniquely desirable and critical for the proper

functioning" of the Avaya PDS systems and that "Avaya is the *only* source" for the patches and

upgrades. (Id. ¶ 349 (emphasis in original).)  The Counterclaimants contend that the tying is

unlawful *per se* and unlawful under the Rule of Reason. (Id. ¶ 351.)

## II.    DISCUSSION

### A.    Motion to Dismiss Standard

A complaint will survive a motion under Rule 12(b)(6) if it states plausible grounds for

plaintiff's entitlement to the relief sought. Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955,

1965-66 (2007) (abrogating the Conley standard that the "complaint should not be dismissed for

failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts

in support of his claim which would entitle him to relief").  In other words, it must contain

sufficient factual allegations to raise a right to relief above the speculative level. Id. at 1965.

However, in light of Twombly, the Third Circuit has held that "[i]t remains an acceptable

statement of the standard, for example, that courts 'accept all factual allegations as true, construe

the complaint in the light most favorable to the plaintiff, and determine whether, under any

reasonable reading of the complaint, the plaintiff may be entitled to relief'." Phillips v. County

of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (citations omitted).  The issue before the Court

"is not whether plaintiff will ultimately prevail but whether the claimant is entitled to offer

evidence in support of the claims." Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d

Cir. 1997) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

### B.    Sherman Act

### 1.    Section 1

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. "To establish a violation of Section 1, a plaintiff must prove: (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." Gordon v. Lewistown Hosp., 423 F.3d 184, 207 (3d Cir. 2005).

To determine whether a particular action unreasonably restrains trade, courts have applied one of two different methods of analysis: (1) the *per se* rule; and (2) the rule of reason. Under the *per se* rule, certain categories of restraints are simply presumed to be unreasonable and no elaborate inquiry is necessary. See, e.g., Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723 (1988) ("*per se* rules are appropriate only for 'conduct that is manifestly anticompetitive'") (quoting Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 50 (1977)). On the other hand, the rule of reason, which is the "prevailing standard," ordinarily requires the Court to engage in a detailed analysis of the effect that the restraint has on competition in a relevant market. See Sylvania Inc., 433 U.S. at 49 (holding that the rule of reason typically requires a detailed examination "in light of the competitive situation in 'the product market as a whole'"); United States v. Brown Univ., 5 F.3d 658, 672 (3d Cir. 1993) (holding that the rule of reason "ordinarily requires a detailed inquiry into the market impact of a restraint").[6]

---

[6]"[A] third standard that falls somewhere between the rule of reason and per se standards" is the "quick look" rule of reason. Rossi v. Standard Roofing, Inc., 156 F.3d 452, 461 n.6 (3d Cir. 1998). This method "applies in cases where per se condemnation is inappropriate but where

### 2. Section 2

Section 2 of the Sherman Act provides as follows:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 2. The "right to maintain a private cause of action for damages arising under Section 2 of the Sherman Act flows from Section 4 of the Clayton Act." Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co., 113 F.3d 405, 413 (3d Cir. 1997). Section 4 of the Clayton Act provides, in relevant part, that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent." 15 U.S.C. § 15(a).

As discussed above, Counterclaimants assert claims for monopolization, attempted monopolization and conspiracy to monopolize. To state a claim for monopolization, a party must allege facts sufficient to show: "(1) the possession of monopoly power in a relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident."

---

no elaborate industry analysis is required to demonstrate the anticompetitive character of an inherently suspect restraint." Gordon, 423 F.3d at 209-210 (citing Brown Univ., 5 F.3d at 669). Under the "quick look" method, "the competitive harm is presumed and the defendant must set forth some competitive justification for the restraints." Id. at 210. "[T]he quick look approach may be applied only when an observer with even a rudimentary understanding of economics could conclude that the arrangement in question would have an anticompetitive effect on customers and markets." Id.

Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 481 (1992) (citing United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)).

To state a claim for attempted monopolization, a party must allege facts sufficient to show: (1) predatory or anticompetitive conduct; (2) specific intent to monopolize; and (3) a dangerous probability of achieving monopoly power. Spectrum Sports v. McQuillan, 506 U.S. 447, 456 (1993); Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997). "In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." Spectrum Sports, 506 U.S. at 456.

The elements of a conspiracy to monopolize include: (1) a combination or conspiracy; (2) an overt act in furtherance of the conspiracy; and (3) specific intent to monopolize. Howard Hess Dental Labs. Inc. v. Dentsply Intern., Inc., 516 F. Supp. 2d 324, 341 (D. Del. 2007); Carpet Group Int'l v. Oriental Rug Imps. Ass'n, 256 F. Supp. 2d 249, 283 (D.N.J. 2003). Courts are divided over whether a dangerous probability of success is required to establish a conspiracy to monopolize. Compare Carpet Group Int', 256 F. Supp. 2d at 283 (requiring a dangerous probability of success); Urdinaran v. Aarons, 115 F. Supp. 2d 484, 491 (D.N.J. 2000) (same), with Howard Hess Dental Labs., 516 F. Supp. 2d at 341 (not listing dangerous probability of success as an element); Rome Ambulatory Surgical Ctr. v. Rome Mem'l Hosp., 349 F. Supp. 2d 389, 420 (N.D.N.Y. 2004) ("proof of a conspiracy to monopolize does not require a dangerous probability of success"). In any event, the alleged conspiracy, if successful, must result in an illegal monopolization. Therefore, the allegations must address market power or market share in a relevant market. See Dickson v. Microsoft Corp., 309 F.3d 193, 211 (4th Cir. 2002)

17

(conspiracy to monopolize claim failed due to lack of allegations regarding market power or market share).

### C.    Application

#### 1.    PBX-related Counterclaims

##### a.    Relevant Market

In order for any of the antitrust counterclaims to survive the present motion, the Counterclaimants must allege a plausible relevant market.[7]  In antitrust law, "relevant market" means the "one relevant to the particular legal issue at hand."  2B Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application (3d ed. 2007) ¶ 533.  "'The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'"  Queen City Pizza, 124 F.3d at 436 (citing Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962); Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir. 1991)).  As the Third Circuit noted, "'[c]ross-elasticity of demand is a measure of the substitutability of products from the point of view of buyers. More technically, it measures the responsiveness of the demand for one product to changes in the price of a different product.'"  Queen City Pizza, 124 F.3d at 438 n.6 (quoting E. Thomas Sullivan and Jeffrey L. Harrison, Understanding Antitrust and its Economic Implications 217 (1994)).

The Counterclaims state that the relevant product market for the PBX-related counterclaims is "the post-warranty service and maintenance for Avaya Definity systems, including the submarkets for the provision of service and maintenance and the sale of

---

[7] Counterclaimants do not dispute this.

maintenance contracts." (Counterclaims ¶ 296.) The proposed relevant market is a so-called "aftermarket" for post-warranty service and maintenance on the Definity system. The "foremarket" or "primary market" would be the market for telecommunications systems, reasonably substitutable for Avaya's Definity PBX system. Avaya argues that Counterclaimants have not alleged facts sufficient to support a plausible relevant market.(Avaya's Br. at 9-17.)

The Third Circuit has recognized that relative to typical Section 2 cases, "[a]ftermarket monopolization cases require a more comprehensive analysis, because market share data standing alone is not necessarily a reliable proxy for monopoly power." Harrison Aire, Inc. v. Aerostar Int'l, Inc., 423 F.3d 374, 381 (3d Cir. 2005). This is because "high aftermarket share is not necessarily indicative of monopoly power-i.e., the power to charge and maintain a supracompetitive price-because aftermarket behavior generally is disciplined by competition in the primary market." Id. at 381-82. The Third Circuit explained that "[i]f the primary market is competitive, a firm exploiting its aftermarket customers ordinarily is engaged in a short-run game-for when buyers evaluate the 'lifecycle' cost of the product, the cost of the product over its full service life, they will shop elsewhere." Id. at 382. However, this "conventional antitrust theory" may not be accurate where significant information and switching costs sever the link between the primary market and the aftermarket. Id.[8]

The central case on this issue is Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451 (1992). In Kodak, the Supreme Court affirmed Ninth Circuit's reversal of the

---

[8] "Information costs are barriers that prevent primary market consumers from evaluating the lifecycle costs of a product." Harrison Aire, Inc., 423 F.3d at 382. Switching costs inhibit movement to another product in the primary market and serve to "lock in" the aftermarket customers. Id. at 383.

19

district court's grant of Kodak's motion for summary judgment. The motion sought dismissal of tying and monopolization claims filed by an independent servicer of Kodak photocopiers. The relevant market in <u>Kodak</u> was the aftermarket for Kodak photocopier parts and service. The foremarket for photocopiers was competitive. Historically, Kodak customers were able to obtain repair services from independent services organizations that charged less than Kodak did for similar services. Kodak changed its policy regarding replacement parts and began selling replacement parts only to customers that also purchased Kodak services or repaired their own photocopiers. Thus, Kodak allegedly used its power in the market for replacement parts to "squeeze the independent services providers out of the repair market and to force copier purchasers to obtain service directly from Kodak, at higher cost." <u>Queen City Pizza</u>, 124 F.3d at 440. The Supreme Court stated that:

> Given the potentially high cost of information and the possibility that a seller may be able to price discriminate between knowledgeable and unsophisticated consumers, it makes little sense to assume, in the absence of any evidentiary support, that equipment-purchasing decisions are based on an accurate assessment of the total cost of equipment, service, and parts over the lifetime of the machine.

504 U.S. at 475-76. The Third Circuit has recognized that <u>Kodak</u> "held that primary market competition does not necessarily preclude monopoly power in the relevant aftermarket where a unilateral policy change targets 'locked-in' customers." <u>Harrison Aire</u>, 423 F.3d at 383.[9]

---

[9] Whether the Court analyzes Avaya's "relevant market" argument under the rubric of market power or relevant market makes little difference. As the <u>Kodak</u> Court stated: "Because market power is often inferred from market share, market definition generally determines the result of the case. Kodak chose to focus on market power directly rather than arguing that the relationship between equipment and service and parts is such that the three should be included in the same market definition. Whether considered in the conceptual category of 'market definition' or 'market power,' the ultimate inquiry is the same - whether competition in the equipment market will significantly restrain power in the service and parts markets." <u>Kodak</u>, 504 U.S. at 469 n.15 (citations omitted). Indeed the Third Circuit has dealt with <u>Kodak</u> under both

In its present motion, Avaya does not contend that there are reasonably interchangeable substitutes outside the proposed relevant market, but instead argues that competition in the primary market for PBX systems precludes a holding that the service and maintenance aftermarket is a relevant antitrust market. Avaya argues that the Counterclaimants "do not allege Kodak-like circumstances amounting to the unlawful exercise of market power in an aftermarket." (Avaya's Reply Br. at 4-5.)[10] More specifically, Avaya argues that "Counterclaimants do not allege that Avaya . . . *relied* on unauthorized service providers to provide for maintenance of the PBX systems . . . that Avaya PBX owners purchased their systems under a misimpression . . . or that Avaya at some point prior to this lawsuit changed its . . . policy of restricting access to its proprietary maintenance software." (Avaya Br. at 14 (emphasis in original).) In its reply brief Avaya clarifies that "unlike the plaintiffs in Kodak, Counterclaimants do not allege that Avaya or its predecessors ever voluntarily made access to their PBX maintenance software available to any unauthorized service provider . . . let alone that Avaya or its predecessors *relied* on unauthorized service providers." (Avaya's Reply Br. at 6 (emphasis in original).) Avaya also appears to be arguing that Kodak only applies where the manufacturer originally dealt with independents and later cut them off. (Avaya's Br. at 3, 14

---

conceptual categories. Compare Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 515 (3d Cir. 1998) (granting summary judgment where plaintiff could not establish that the aftermarket was a relevant market); Queen City Pizza, 124 F.3d 430 (granting a motion to dismiss for failure to plead a plausible relevant market), with Harrison Aire, 423 F.3d at 381-85 (applying Kodak in a market power context).

[10] Avaya mistakenly claims that "Counterclaimants have expressly alleged only one relevant antitrust product market for the purpose of all of their antitrust claims." (Avaya's Br. at 9.) As discussed above, Avaya alleges that one relevant market applies to its PBX-related antitrust counterclaims (Counterclaims ¶ 296), while a different relevant market applies to its PDS-related antitrust counterclaim (Id. ¶ 342.)

(citing David A.J. Goldfine & Kenneth M. Vorassi, The Fall of Kodak Aftermarket Doctrine: Dying a Slow Death in the Lower Courts, 72 Antitrust L.J. 209, 221 (2004)).)

The Court concludes that Counterclaimants have alleged a plausible relevant market. It appears that Avaya misreads Kodak in at least two ways. First, Avaya reads the Kodak case too narrowly when it contends that Kodak only applies to situations where the manufacturer had previously dealt directly with independent servicers.[11] The reasoning underlying Kodak - namely that a manufacturer can violate Section 2 where it undertakes some sort of opportunistic conduct to target a group of customers that are "locked in" due to information costs and switching costs - extends to situations beyond those where the manufacturer has dealt directly with the ISPs. For example, Counterclaimants allege that ISPs previously had access to the Definity system software for maintenance purpose by way of the owner's access to MSPs, but that Avaya now only provides MSPs to owners that have a maintenance contract with Avaya or a BusinessPartner. (Counterclaims ¶¶ 151, 177, 208, 220.) At this stage of the litigation, the Court concludes that it is plausible that the purchasers in the PBX primary market relied on the ISPs' allegedly lower cost and higher quality service and maintenance alternative when purchasing the Definity system. Moreover, it is plausible that when, in March 2005, Avaya made changes to its policies regarding MSP usage so as to make it cost prohibitive for the Definity system owners to use an ISP in this manner, Avaya was making a policy change that targeted the "locked-in" Definity system owners and thereby violated the antitrust laws.

---

[11] Avaya may also be reading Kodak too narrowly in contending that it only applies to a situation in which a manufacturer has changed a policy relating to the aftermarket. See Harrison Aire, 423 F.3d at 384 ("an 'aftermarket policy change' is not the *sine qua non* of a Kodak claim"). The Court need not reach this issue because Counterclaimants allege such a change in policy.

Similarly, Avaya's contention that the principle in <u>Kodak</u> is limited to situations where the manufacture itself "relies" on the ISPs is incorrect.  "The relevant market for antitrust purposes is determined by the choices available to [the] equipment owners." <u>Kodak</u>, 504 at 481-82.  Therefore, the manufacturer's reliance or lack thereof is not the proper focus of the determination as to whether the alleged market is plausible.  The proper focus is on what alternatives were available to purchasers in the primary PBX market.  As discussed above, to the extent that the purchasers in the PBX market previously had the option of acquiring lower cost and/or higher quality service and maintenance from ISPs, <u>Kodak</u>'s reasoning applies.

Moreover, Avaya's contention that Counterclaimants do not allege that "Avaya PBX owners purchased their systems under [the] misimpression" that ISPs were able to access the system for service, (Avaya Br. at 14), appears incorrect.  <u>See</u>, <u>e.g.</u>, Counterclaims ¶ 168 ("purchasers of Definity systems reasonably believed that, with their purchase of the Definity platform, they were purchasing the ability to access and utilize the commands to perform the maintenance functions"); ¶ 208 (ISPs could previously use MSPs of the system owner).  Indeed, the Counterclaimants allege that, as of 2003, Avaya discussed all of the options available to a customer for maintenance, including maintenance through an independent servicer.  (<u>Id.</u> ¶ 208.)

Therefore, the Court will not dismiss the antitrust Counterclaims for failure to plead a relevant market.

> **b.    Monopolization Counterclaim:  Denial of Access as Anticompetitive Conduct**

Avaya next argues that the "monopolization claim fails for the additional reason that Counterclaimants have not made sufficient allegations of anticompetitive conduct."  (Avaya's Br.

at 19.)  In short, Avaya contends that it cannot be held liable for "unilaterally refusing to deal

with a competitor."  (<u>Id.</u>)  Avaya argues that its decision not to allow ISPs access to logins is

permissible under <u>United States v. Colgate & Co.</u>, which recognized that Section 2 "does not

restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private

business, freely to exercise his own independent discretion as to parties with whom he will deal."

250 U.S. 300, 307 (1919).[12]  According to Avaya, the "sole exception to the broad right of a firm

to refuse to deal with its competitors" is when "the monopolist elected to make an important

change in a pattern of distribution that had originated in a competitive market and had persisted

for several years."  (Avaya's Br. at 20-21 (citing <u>Aspen Skiing Co. v. Aspen Highlands Skiing</u>

<u>Corp.</u>, 472 U.S. 585, 602-03 (1985).)  Avaya acknowledges that the Counterclaims state that

there was "'a period of cooperation' during which Avaya worked with and encouraged 'TLI and

other third party service providers' to 'provide maintenance to owners of Avaya Definity

platforms following Lucent's and Avaya's downsizing in 2000.'"  (<u>Id.</u> at 21 (citing Counterclaims

¶ 302).)  But Avaya contends that the Counterclaimants "do not plead any specific facts to

support this conclusory allegation, and they do not allege any 'cooperation' between Avaya and

Continuant."  (<u>Id.</u> at 21-22.)  Moreover, Avaya asserts that there is no allegation "that any

cooperation occurred at a time TLI was *not* an authorized Avaya BusinessPartner."  (<u>Id.</u> at 22

(emphasis in original).)  Avaya contends that it "has never cooperated with or made passwords

available to unauthorized service providers . . . and Counterclaimants make no allegation to the

---

[12] Avaya argues that because "unauthorized service providers cannot provide maintenance at all . . . then the 'other anticompetitive conduct'" referenced by Counterclaimants "could not have excluded them" because "they were already excluded by the denial of access to the proprietary maintenance software."  (Avaya's Reply Br. at 7.)

contrary." (Id. at 22-23.) Avaya asserts that it "merely continued to adhere to its long-standing practice of refusing to provide unauthorized service providers with logins and passwords used to access and use its proprietary software." (Id. at 23.) Avaya concludes that "Counterclaimants *must* allege and prove that Avaya and its predecessors voluntarily provided their maintenance software to unauthorized service providers and then cut off access." (Avaya's Reply Br. at 10.) Finally, Avaya also contends, in a footnote in its reply brief, that "[t]here obviously are good business reasons for [Avaya] to limit access to its maintenance software to its own dealers and to PBX owners who self-maintain and pay the manufacturer for software access" (Avaya's Reply Br. at 8 n.9).

The Court rejects Avaya's argument. As the Supreme Court noted in Kodak, "[i]t is true that as a general matter a firm can refuse to deal with its competitors. But such a right is not absolute; it exists only if there are legitimate competitive reasons for the refusal." 504 U.S. at 483 n.32 (citing Aspen Skiing, 472 U.S. at 602-605.). In Kodak, the Court found there were genuine issues of fact concerning whether Kodak's business justifications for its actions were pretextual. Therefore, the Court denied summary judgment.

Of course, here the Court is addressing a motion to dismiss, not a summary judgment motion. As discussed above, the Counterclaimants allege a plausible relevant market under Kodak. Moreover, Counterclaimants allege that Avaya made changes in policy that excluded the ISPs from the market for service and maintenance of Avaya Definity systems. More specifically, Counterclaimants allege anticompetitive conduct that consists of, among other things, the "constantly shifting . . . policies with regard to customers' and ISPs' ability to access the customers' Avaya systems." (Counterclaims ¶ 303.) As discussed above, Counterclaimants

25

specifically assert that they were able to access the Definity system for maintenance purposes through Definity system owners' MSPs and that Avaya changed this policy for anticompetitive reasons. The Counterclaimants also allege that "Avaya's anti-competitive and exclusionary conduct . . . is not motivated by technological or efficiency concerns and has no valid or legitimate business justification." (Counterclaims ¶ 305.) These allegation are sufficient at this stage of the litigation.

Finally, Avaya's argument that "[t]here obviously are good business reasons for [Avaya] to limit access to its maintenance software to its own dealers and to PBX owners who self-maintain and pay the manufacturer for software access" (Avaya's Reply Br. at 8 n.9) is contrary to the allegations in the Counterclaims and is not properly resolved at this stage of the litigation.[13]

### c.    Attempted Monopolization Counterclaim

The only argument that Avaya makes regarding the attempted monopolization counterclaim is that it should be dismissed due to the failure to allege a plausible relevant market. (Avaya Br. at 26-27.) However, as discussed above, the Court concludes that Counterclaimants have alleged a plausible relevant market. Therefore the Court will not dismiss the attempted monopolization counterclaim on this ground.

### d.    Conspiracy to Monopolize Counterclaim

Avaya argues in its moving brief that the Conspiracy to Monopolize counterclaim must be dismissed for the following three reasons: (1) Counterclaimants have not alleged a plausible

---

[13] Avaya's citation, in the same footnote, to United Asset Coverage, Inc. v. Avaya, Inc., 409 F. Supp. 2d 1008 (N.D. Ill. 2006) is unhelpful here, because in that case, the court conducted an evidentiary hearing prior to ruling on the pending motion for a preliminary injunction. (Avaya's Reply Br. at 8 n. 9.) Here, on the other hand, the Court must assume the facts alleged in the Counterclaims are true.

relevant market; (2) the Counterclaimants do not make the required allegation that the co-conspirators shared a specific intent to monopolize; and (3) the Counterclaimants have not made sufficiently particularized allegations of facts to support the conspiracy claim.  (Avaya's Br. at 24-26.)[14]  In its reply brief, Avaya also contends that Counterclaimants have not alleged concerted action that excluded the ISPs.  (Avaya's Reply Br. at 11 & n.12.)

Counterclaimants argue that the conspiracy between Avaya and its BusinessPartners was accomplished through: (1) revisions to the "Avaya One" contract; and (2) an agreement entitled "Sales Engagement Principles."  Through these agreements, the conspirators allegedly agreed not to solicit maintenance business from each other's customers and not to replace each other's service contracts.  (Counterclaims ¶¶ 112-123.)  The Counterclaimants further alleged that under the "Sales Engagement Principles," Avaya reserved the right to control the sales to certain of the largest customers and the right to solicit the service business from any account even if they were an existing customer of a BusinessPartner.  Counterclaimants assert that the conspirators "thereby conspir[ed] with Avaya to allocate the remainder of the maintenance and service market for Avaya PBX Systems by excluding competition from ISPs."  (Counterclaimants Br. at 28.)

The Court concludes that Counterclaimants have not alleged facts that would support a finding that the BusinessPartners had a specific intent to monopolize.   "The specific intent element requires plaintiffs to plead that [the] alleged conspirators 'had a conscious commitment to [the] common scheme designed to achieve an unlawful objective, namely that of endowing . . . monopoly power." Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 516 F. Supp. 2d 324, 341-43 (D. Del. 2007) (quoting ID Security Systems Canada, Inc. v. Checkpoint Sys., Inc., 249 F.

---

[14] The first of these arguments was rejected above.

Supp. 2d 622, 660 (E.D. Pa. 2003) (citation and internal quotations omitted)); see also In re

Microsoft Corp. Antitrust Litig., 127 F. Supp. 2d 728, 731 (D. Md. 2001) (specific intent

"signifies something more than willing, voluntary, and knowing participation in the illegal course

of conduct . . . . It means participating in that course of conduct for the specific, shared purpose of

maintaining [the] monopolies."), aff'd 309 F.3d 193 (4th Cir. 2002). Here, there is simply no

factual allegation that could support such a conscious commitment to monopolize on behalf of the

unnamed BusinessPartners. See In re Microsoft, 127 F. Supp. 2d at 731 ("it is not enough to

establish a section 2 conspiracy that the OEM defendants, confronted with demands made upon

them by Microsoft by virtue of its monopoly power, decided to accede to those demands in order

to gain advantage over their rivals in the markets in which they competed"). Counterclaimants

argument in their brief that the "unmistakable impact" of the Counterclaims is that the

BusinessPartners intended to monopolize the relevant market is both unconvincing and

unsupported by any citation to case law or to the Counterclaims. (Counterclaimants' Br. at 29.)

Therefore, the Court will dismiss the conspiracy to monopolize counterclaim for this reason.[15]

> **e.     Tying in Violation of Sherman Act Section 1 Counterclaim**

Counterclaimants allege that "Avaya has conditioned the purchase or receipt of patches

and upgrades for Avaya Definity systems (the 'tying products') on the purchase of service and

maintenance for Avaya Definity systems (the 'tied products')." (Counterclaims ¶ 334.)

Avaya contends that to adequately state a tying claim, Counterclaimants must allege facts

---

[15] Additionally, to the extent the counterclaims allege a "shared monopoly" or "joint monopoly," the counterclaim is questionable at best. See Santana Products, Inc. v. Bobrick Washroom Equip., Inc., 249 F. Supp. 2d 463, 519-520 (M.D. Pa. 2003) ("a 'shared monopoly,' as alleged by Santana, is not cognizable under section 2"), aff'd in part & rev'd in part, 401 F.3d 123 (3d Cir.), cert. denied, 126 S.C.t 734 (2005)

sufficient to establish that Avaya had market power in the relevant tying market and that the tied product was sold in a separate relevant market. (Avaya's Br. at 27-28.) On this basis, Avaya argues that this tying counterclaim should be dismiss for five reasons. First, Avaya argues that the Counterclaimants have not alleged facts to support a single relevant market encompassing the two tying products: patches and upgrades. Second, Avaya argues that a proposed relevant market limited to the aftermarket of "patches" alone is insufficient because it does not contain allegations sufficient under Kodak, namely allegations that owners purchased their PBX systems with the expectation that they could obtain patches. Third, Avaya argues that a proposed relevant market limited to upgrades is insufficient because the Counterclaimants allege that new PBX systems are alternative to upgrades. Fourth, Avaya seeks to have the Court consider a "Service Bulletin," which it claims demonstrates that Counterclaimants have "falsely alleged" that Avaya advised its PBX owners that they would not be able to purchase upgrades if they used ISPs. Fifth, Avaya repeats its assertion, rejected above, that the aftermarket for maintenance of PBX systems is not a plausible relevant market.

Counterclaimants respond by arguing that they have alleged the elements for both a *per se* and Rule of Reason tying violations. The Counterclaimants address Avaya's first argument by assrting that the tying market is either "patches, upgrades, or both" and that "pleading in the alternative" is permissible. (Counterclaimants' Br. at 33.) As to the second argument, Counterclaimants assert that Kodak does not require an aftermarket policy change and in any event the Counterclaims clearly allege such a change. With respect to the third argument made by Avaya, Counterclaimants argue that the allegations relied upon by Avaya to argue that upgrades are in the same market as new equipment "can only fairly be seen as stating that locked-in Avaya

PBX owners have been forced to purchase upgrades rather than replace their entire systems because of prohibitive switching costs."  (Id.)  Finally, Counterclaims admit that they incorrectly alleged that in 2005, Avaya advised the Definity system owners that it would no longer furnish upgrades to those owners that used ISPs.  However, Counterclaimants assert that their allegation regarding Avaya's effort in 2007 to tie a new upgrade to Avaya support suffices.

The Court concludes that the tying counterclaim is insufficient because Counterclaimants have not alleged facts to support a plausible relevant market encompassing the two tying products: patches and upgrades.  See Queen City Pizza, 124 F.3d 443 ("The first inquiry in any § 1 tying case is whether the defendant has sufficient market power over the tying product, which requires a finding that two separate product markets exist and a determination precisely what the tying and tied products are.") (citations omitted).  Counterclaimants' argument in their opposition brief that they are asserting relevant markets in the alternative is unsupported by the Counterclaims themselves.  (Counterclaims ¶¶ 330-39.)  Counterclaimants have defined patches and upgrades differently and there is no indication that they are reasonably interchangeable.  (Id. ¶ 11 (patches are "corrections of software errors" and upgrades are "a new release or version of a software application"); Id. ¶ 223 ("patches, are not considered upgrades").)  Therefore, the Court will dismiss the PBX tying counterclaim without prejudice.  See Queen City Pizza, 124 F.3d at 436 ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.").[16]

---

[16] Additionally, to the extent the counterclaims allege a "shared monopoly" or "joint monopoly," the counterclaim is questionable at best.  See Santana Products, Inc. v. Bobrick Washroom Equip., Inc., 249 F. Supp. 2d 463, 519-520 (M.D. Pa. 2003) ("a 'shared monopoly,' as alleged by Santana, is not cognizable under section 2"), aff'd in part & rev'd in part, 401 F.3d 123 (3d Cir.), cert. denied, 126 S.C.t 734 (2005).

f.    **Illegal Conspiracy in Violation of Sherman Act Section 1
Counterclaim**

Counterclaimants allege that in violation of Section 1, "Avaya has orchestrated a

horizontal conspiracy involving certain of its BusinessPartners, distributors of certified Avaya

parts, and others to allocate the maintenance and service business of Definity owners, to restrict

the output of available maintenance and service, and, as a result, to fix and raise the prices of

maintenance and service paid by owners." (Counterclaims ¶ 355.)  Counterclaimants assert that

this is a *per se* illegal conspiracy, and that in the event it is found to not be unlawful *per se*, it is a

illegal under the rule of reason.  (Id. ¶ 357.)

Avaya makes three arguments in support of dismissal of this counterclaim.  First, Avaya

asserts that this counterclaim must fail because Counterclaimants have not alleged a plausible

relevant market.  (Avaya's Br. at 35-36.)  Second, Avaya next argues that the facts alleged do not

give rise to a *per se* violation because the alleged conspiracy is vertical, not horizontal.  (Id. at 36-

39.)  More specifically, Avaya contends that the counterclaim involves "Avaya's imposition of

vertical restraints on its authorized dealers."  (Id. at 36.)  Avaya argues that the fact that it

competes with its BusinessPartners does not, in itself, make the alleged agreements horizontal.

(Id. at 38.)  Third, Avaya argues that the Counterclaims do not allege facts sufficient to establish a

Section 1 Rule of Reason claim. (Id. at 39.)  More specifically, Avaya asserts that

Counterclaimants do not: (1) identify "any of the alleged co-conspirators by name" other than

Avaya; (2) do not allege that any particular communications or meeting facilitated the purported

conspiracy; and (3) do not identify the "terms and conditions of sale " the manner in which the

"customers and territories" were allocated, or the steps that the co-conspirators used to eliminate

31

competition from the ISPs.   (Id. at 40-41.)

Counterclaimants respond by asserting that they have adequately alleged both a *per se* and Rule of Reason violation.  Counterclaimants state that they have alleged in detail how Avaya and the BusinessPartners, while in competition with each other, acted in concert to restrict output, allocate customers, limit the terms and conditions of competition and boycott other ISPs so as to force Definity system owners to pay higher prices for maintenance and service.  (Counterclaimants' Br. at 37-38.)  Counterclaimants argue that because Avaya competes with its dealers, it is a horizontal conspiracy and because Avaya and BusinessPartners have entered into agreements with each other to conspire, the alleged conduct is not unilateral, but is "bi-lateral or multi-lateral" conduct.  (Id. at 38-39.)  Counterclaimants argue that the allegations here concern restraints in "interbrand competition," because Avaya and its BusinessPartners agreed "about conditions under which BusinessPartners may compete with Avaya when offering a BusinessPartner's *own* brand of maintenance for Avaya systems."  (Id. (emphasis in original).)  Counterclaimants also assert that Avaya is asking the Court to draw factual conclusions regarding the nature of the restraints, which would be inappropriate on a motion to dismiss.  Additionally, Counterclaimants argue that they have alleged sufficient facts to support their conspiracy counterclaim.

First, the Court rejects Avaya's argument concerning the sufficiency of the relevant market allegations for the reasons discussed above.

Second, the Court agrees with Avaya that the alleged conspiracy should not be treated as a *per se* violation.  "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints."  Business Elecs. Corp., 485 U.S. at 730.  The Third

32

Circuit has held that so-called "direct distributor arrangements" where "a distributor and manufacturer also compete at the distribution level, *i.e.*, have some form of horizontal relationship" are not generally *per se* violations.  See AT&T Corp. v. JMC Telecom, LLC, 470 F.3d 525, 531 (3d Cir. 2006).  The AT&T case involved a situation where "AT&T would provide prepaid calling services to JMC and JMC in turn would sell the services as prepaid telephone cards to end-users." Id. at 528.  However, AT&T "also sold phone cards at the resale level." Id. at 531.  The Third Circuit agreed with other circuits in holding that such dual distributor arrangements are "primarily vertical" and therefore, not subject to *per se* condemnation.  Id.

The present case is arguably different, because the alleged restraint involves not only a dual distributor arrangement between Avaya and dealers in the PBX system sales market, but also a horizontal arrangement in the service and maintenance aftermarket.

The Court has not found any Third Circuit cases that involve both a dual distributor arrangement in a primary market and a horizontal relationship in a plausible relevant aftermarket. However, the Ninth Circuit has addressed a similar situation under California state antitrust law. Dimidowich v. Bell & Howell, 803 F.2d 1473, 1480-81 (9th Cir. 1986).  In Dimidowich, the Ninth Circuit was confronted with an alleged conspiracy between two companies, B&H and Compgraphix, to divide the market for service and to refuse to deal with Plaintiff, Dimidowich. B&H manufactured "micrographic equipment" and "distribute[d] its own products to much of the country, but use[d] Comgraphix as a distributor in the Southwest." Id. at 1480.  The Ninth Circuit recognized that such a relationship was a "dual distributorship."  Id.  However, B&H also competed with Comgraphix in a separate "service market." Id.  The Ninth Circuit stated that "the alleged conspirators are in a 'hybrid' arrangement composed of both a dual distributorship and a

33

horizontal relationship." Id. at 1480-81. The Court admitted that it did "not have enough experience with [hybrid] arrangement[s] to say with any confidence that a concerted refusal to deal in this context almost always will be anticompetitive." Id. at 1481. Therefore, the court concluded that "[b]ecause of the vertical element of the alleged 'hybrid' agreement, the restriction in the service market may well result in the same type of significant procompetitive effects in the product market as do restrictions in the context of a dual distributorship." Id. Accordingly, the court concluded that a Rule of Reason analysis would be appropriate.

This Court agrees with the reasoning of the Dimidowich court. Here, there was a dual distributor arrangement in the market for PBX systems and a horizontal relationship in the service and maintenance aftermarket. Like the Ninth Circuit, this Court does not have enough experience with this type of arrangement to say that it will almost always be anticompetitive. Therefore, the Court concludes that a Rule of Reason analysis is appropriate.

Finally, the Court rejects Avaya's argument that the conspiracy allegations are insufficiently "particularized." (Avaya's Br. at 41.) First, in Twombly, the "concern is not that the allegations in the complaint were insufficiently 'particular[ized],' rather, the complaint warranted dismissal because it failed in toto to render plaintiffs' entitlement to relief plausible." Twombly, 127 S.Ct. at 1973 n.14 (citation omitted). Second, here the conspiracy allegations are plausible. Unlike in Twombly, specific actual agreements are alleged, not mere parallel conduct.[17] Moreover, contrary to Avaya's contentions, the co-conspirators do not need to be identified by

---

[17] As discussed above, Counterclaimants allege a conspiracy by way of the Avaya One contract and the Sales Engagement Principles agreement. Thus, Avaya is incorrect in stating that no particular communications or meetings are alleged. (Avaya's Br. at 40.)

name - it is sufficient for Rule 8 purposes to identify them as Avaya's "BusinessPartners."[18] However, to the extent Counterclaimants allege the conspiracy extends to parties other than Avaya and its BusinessPartners, (Counterclaims ¶ 355), the counterclaim is dismissed. There are simply no factual allegation regarding any conspiracy concerning these non-BusinessPartner entities. Finally, Avaya's contetition that Counterclaimants have not identified the "terms and conditions of sale," the manner in which the "customers and territories" were allocated or the steps that the alleged conspirators used to eliminate ISP competition is not persuasive. Counterclaimants alleged that Avaya and the BusinessPartners (through the so-called "BusinessPartner Council") agreed on September 1, 2003 by way of an agreement alternatively called "Rules of Engagement" and "Sales Engagement Principles" to not solicit maintenance business from each other's customers and not to attempt to replace the other's service contracts. Counterclaimants also allege that, as part of the Sales Engagement Principles, Avaya reserved "the right to control the sale of maintenance" to certain named accounts that "represented Avaya's largest and most valued customers." (Counterclaims ¶ 122.) Counterclaimants also allege that the Avaya One contract, which prohibited the BusinessPartners from offering competitive maintenance contracts to any existing Avaya maintenance customer is additional evidence of the conspiracy between those BusinessPartners and Avaya to allocate the relevant market.

For the foregoing reasons, the Court concludes that the Counterclaims provide sufficiently plausible grounds for the Section 1 conspiracy counterclaim to survive the present motion.[19]

---

[18] Avaya has cited no authority to the contrary. Moreover, Avaya presumably knows who its BusinessPartners are, as it has entered into an "Avaya One" contract with each of them.

[19] In the final footnote in Avaya's moving brief, (Avaya's Br. at 41 n.38), Avaya states that "a non-participating competitor typically does not have standing to challenge" an agreement

### 2.    PDS Counterclaim:  Tying in Violation of Section 1

The Counterclaims specify that "[f]or purposes of this claim the relevant [product] market . . . is the market for post-warranty service and maintenance of PDS systems purchased from Avaya." (Counterclaims ¶ 342.)  Counterclaimants assert that this market is separate from the "primary U.S. market for the sale of PDS systems" and that there are no "reasonably interchangeable substitutes" for such service and maintenance.  (Id.)  Counterclaimants assert that "virtually all, if not all owners of Avaya PDS systems are 'locked into' their PDS purchases" due to high switching costs and the platform's long useful life.  (Id. ¶ 343.)  Moreover, according to the Counterclaims, the PDS customers were, for various reasons, unable to predict the "life-cycle cost" for their PDS system.  (Id. ¶ 344.)   The Counterclaims state that the PDS patches and upgrades "are uniquely desirable and critical for the proper functioning" of the Avaya PDS systems and that "Avaya is the *only* source" for the patches and upgrades.  (Id. ¶ 349.)  The Counterclaims stated that the alleged tying is unlawful *per se* and unlawful under the rule of reason.  (Id. ¶ 351.)

Avaya contends that the Counterclaimants "completely fail to allege facts that can establish" Kodak aftermarkets in PDS "patches and upgrades" or "maintenance."  (Avaya's Br. at 34.)  Moreover, Avaya contends that:

> [i]t is impossible to tell from [the] allegations how costly Counterclaimants allege PDS 'platforms' are apart from the cost of PBX 'platforms,' whether PDS 'platforms are sold with PBX 'platforms', whether Avaya's PDS is the only one that can be used with an Avaya PBX system or whether all, most or few PBX

---

to allocate customers or territories or an agreement to take steps designed to eliminate competition.  But in its reply brief, Avaya clarifies that it is not arguing at this time that the Counterclaimants lack standing to assert their Section 1 counterclaim.  (Avaya's Reply Br. at 16 n.23.)  Therefore, the Court need not address the standing issue.

system owners even acquire PDS.

(Id. at 35.)  Furthermore, Avaya contends that "Counterclaimants have failed to make allegations of facts sufficient to establish that purchasers of Avaya PDS products are 'locked-in.'" (Id.)

The Court concludes that this counterclaim fails for the same reasons the PBX tying counterclaim fails.  This counterclaim also fails because there are no factual allegations regarding "upgrades" for PDS platforms.  The only factual allegeations regarding "upgrades" concern PBX systems.  The Court need not reach the issues of whether the PDS service and maintenance aftermarket is a relevant market under Kodak because, as with Counterclaimants' PBX tying counterclaim, facts have not been alleged that demonstrate the tying market of PDS "patches and upgrades" is a plausible relevant market.

## III.    CONCLUSION

For the foregoing reasons, Avaya's motion to dismiss the first through sixth causes of action of the Counterclaims is granted in part and denied in part.  An appropriate form of order is filed herewith.


Dated: August   29, 2008


_____s/ Garrett E. Brown, Jr._____
GARRETT E. BROWN, JR., U.S.D.J.